1  ANNE K. RICHARDSON (SBN 151541)
   arichardson@publiccounsel.org
2  DEEPIKA SHARMA (SBN 256589)
   dsharma@publiccounsel.org
3  SARAH E. TRUESDELL (SBN 258642)
   Truesdell.publiccounsel@gmail.com
4  PUBLIC COUNSEL
   610 S. Ardmore Avenue
5  Los Angeles, California 90005
   Telephone:  (213) 385-2977
6  Facsimile:   (213) 385-9089

7  *Attorneys for Plaintiffs*

8  *Additional counsel listed following caption*

9

10

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14              WESTERN DIVISION

15

16  CORNELIA MARTINEZ, an individual;      )  CASE NO.: 2:17-cv-3581
    ANA VELASQUEZ, an individual; HILDA    )
17  DERAS, an individual; CARMEN CASTRO,   )  **COMPLAINT FOR**
    an individual; GLORIA MORALES, an      )  **DAMAGES, DECLARATORY**
18  individual, and SAJE, a 501(c)(3) non-profit )  **AND INJUNCTIVE RELIEF**
    organization,                          )
19                                         )  **DEMAND FOR JURY TRIAL**
                    Plaintiffs,            )
20                                         )
                                           )
21              v.                         )
                                           )
22  OPTIMUS PROPERTIES, LLC, a California  )
    limited liability company; ROXBURY     )
23  VENTURES, LLC, a California limited     )
    liability company; MAGNOLIA AVENUE     )
24  PROPERTIES, LLC, a California limited   )
    liability company; and JEROME          )
25  MICKELSON, an individual,              )
                                           )
26                  Defendants.            )
                                           )
27  _____    )

28

_____
                    Complaint

MATTHEW E. SLOAN (SBN 165165)
matthew.sloan@skadden.com
EMILY LUDMIR AVIAD (SBN 251995)
emily.aviad@skadden.com
DANIEL O. BLAU (SBN 305008)
daniel.blau@skadden.com
ROSS M. CUFF (SBN 275093)
ross.cuff@skadden.com
RACHAEL T. SCHIFFMAN (SBN 292005)
rachael.schiffman@skadden.com
ANTONIETA M. PIMIENTA (SBN 304105)
antonieta.pimienta@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

CHRISTOPHER BRANCART (SBN 128475)
cbrancart@brancart.com
BRANCART & BRANCART
8205 Pescadero Road
Loma Mar, California  94021
Telephone:  (650) 879-0141
Facsimile:    (650) 879-1103

ANNE P. BELLOWS (SBN 293722)
abellows@publicadvocates.org
PUBLIC ADVOCATES INC.
131 Steuart Street, Suite 300
San Francisco, California  94105
Telephone:   (415) 431-7430
Facsimile:    (415) 431-1048

*Attorneys for Plaintiffs*

**INTRODUCTION**

1.      In blatant violation of federal and state anti-discrimination laws, Defendants have engaged in concerted and unlawful efforts to flip multifamily apartment buildings in the Koreatown neighborhood of Los Angeles by pushing out tenants whom they consider to be undesirable, including Latino tenants with children at 1423 South Magnolia Avenue. Defendants raise the rents on those units, market the units to childless, English speaking, non-disabled people of means, and increase their profits on the rapid resale of the apartment buildings like the one that Plaintiffs call home. Defendants have made their discriminatory intent explicit. They have said, in so many words, that they will call immigration authorities on Latino tenants who challenged eviction notices; that the smells of Latino cooking are "disgusting" and "foul"; and that families whose children use common areas will be evicted.

2.      Against this backdrop of explicit discrimination and harassment, Defendants employ a number of pernicious, unlawful techniques to push out targeted tenants, as fully detailed below.

3.      Defendants are not only violating well-established rights protected by federal and state law through their discriminatory acts involved in flipping multifamily apartment buildings in the Koreatown neighborhood; to turn a profit, they are putting at risk of displacement and even homelessness some of the most vulnerable Los Angeles residents: low-income individuals with mental disabilities, former foster youth, the formerly homeless, and, as at 1423 South Magnolia Avenue, Latino families living on the edge of poverty.

4.      The individual Plaintiffs in this action are members of classes protected by the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*—Spanish-speaking Latino tenants and tenant families with children—and one non-profit organization serving those tenants, SAJE ("Strategic Actions for a Just Economy").

5.     By this action, Plaintiffs seek to hold the tenants' landlords and management—a network of investors, owners, and operators of apartment buildings in the Koreatown neighborhood of Los Angeles—liable for discrimination in violation of the FHA and related state and local laws.

6.     Defendants are one individual and three interrelated companies, part of a larger network of business entities, who have, since at least 2013, pursued what they have termed their "Koreatown Strategy" centered in Koreatown, a rapidly gentrifying neighborhood of Los Angeles. This strategy consists of purchasing occupied multifamily properties, instituting a discriminatory campaign to force out certain targeted tenants, renovating and re-renting vacated units, then selling or "flipping" the properties for a quick profit at the expense of the tenants they have ejected or sought to eject. The success of this scheme crucially depends on unlawfully displacing a significant number of the existing tenants of these properties.

7.     To accomplish this objective, Defendants have engaged in a pattern or practice of discriminatory conduct targeting and imposing disparate harm on protected classes under the FHA, including Spanish-speaking Latino tenants and tenant families with children, both at 1423 South Magnolia Avenue and at other buildings owned by Defendants in Koreatown. As detailed more fully below, Defendants' discriminatory and unlawful practices in violation of the FHA at 1423 Magnolia Avenue have included, among other practices, (1) subjecting Plaintiffs and similarly situated residents to coercive, unlawful and/or misleading notices designed to intimidate them into leaving; (2) changing the rent payment terms in a manner that makes it more difficult for Plaintiffs and similarly situated residents to pay their rent; (3) interfering with tenants' enjoyment of their housing rights through harassing tactics that include derogatory comments about their national origin; (4) instituting rules that restrict children from making reasonable use of common areas; (5) failing to provide or delaying needed maintenance and repairs to Plaintiffs' units, or providing only substandard maintenance and repairs, while at the same time

providing freshly renovated units in good condition to new tenants; and (6) instituting baseless eviction proceedings against targeted tenants. Moreover, Defendants have subjected Plaintiffs who have opposed Defendants' conduct to retaliation, threats, and intimidation, also in violation of the FHA.

8.      Defendants' conduct has caused profound injury to Plaintiffs. Plaintiffs have endured poor living conditions and humiliating treatment at the hands of Defendants' employees. Repeatedly, as a direct consequence of Defendants' persistent efforts to force them out, Plaintiffs have confronted the threat of losing their homes and becoming homeless. On multiple occasions, only the intervention of supportive non-profit organizations and pro bono counsel prevented Plaintiffs from losing their homes. As a direct result of Defendants' discriminatory and abusive actions, Plaintiffs have suffered significant anxiety, frustration, and fear, in addition to the violation of their civil rights.

9.      Organizational Plaintiff SAJE has also been harmed by the discriminatory and abusive conduct of Defendants. The efforts of Defendants to force out protected classes of tenants have frustrated the organization's mission and interfered with its efforts to support vulnerable tenants in achieving stable, healthy living conditions. SAJE has been forced to divert scarce resources to protecting tenants from Defendants' discriminatory practices, as detailed below.

10.      Moreover, in retaliation for its efforts to assist tenants in exercising their housing rights, SAJE has encountered threats and intimidation from Defendants, as detailed below, in violation of the FHA.

11.      Plaintiffs seek a declaratory judgment, permanent injunctive relief, compensatory and punitive damages, and restitution for Defendants' unlawful behavior. This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*; the California Fair Housing and Employment Act, California Government Code §§ 12900-12996; the Unruh Civil Rights Act, California Civil Code § 51; California Civil Code §§ 1714, 1940.2, 1942.5, 3479; the California

1  Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*;

2  the Los Angeles Rent Stabilization Ordinance, L.A. Municipal Code § 151.00 *et*

3  *seq.*; and California common law.

## JURISDICTION AND VENUE

5  12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343.

6  This action is authorized by 42 U.S.C. § 3613. Declaratory relief is authorized by 28

7  U.S.C. § 2201 and § 2202. This Court has supplemental jurisdiction to consider state

8  law claims pursuant to 28 U.S.C. § 1367.

9  13.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)

10  because (1) at least one Defendant is a resident of this judicial district and all

11  Defendants are residents of the State of California, and (2) a substantial part of the

12  events or omissions giving rise to the claims in this Complaint occurred in this

13  judicial district.

## THE PARTIES

15  **I.     The Plaintiffs**

16  14.     Plaintiff Cornelia Martinez, age 45, has been a resident of 1423 South

17  Magnolia Avenue since 1999. She is Latina, her primary language is Spanish, and

18  she has two minor children, ages 5 and 11, who live with her and her husband.

19  15.     Plaintiff Ana Velasquez, age 41, has been a resident of 1423 South

20  Magnolia Avenue since 2010. She is Latina, her primary language is Spanish, and

21  she has two minor children, ages 1 and 7, who live with her and her husband.

22  16.     Plaintiff Hilda Deras, age 76, has been a resident of 1423 South

23  Magnolia Avenue since 1977. She is Latina and her primary language is Spanish.

24  17.     Plaintiff Carmen Castro, age 31, has been a resident of 1423 South

25  Magnolia Avenue since 2011. She is Latina and lives with her husband and two

26  minor children, ages 5 and 11.

27

28

18.     Plaintiff Gloria Morales, age 39, has been a resident of 1423 South Magnolia Avenue since July 2012.  She is a Spanish-speaking Latina woman who lives with her husband and two minor children, ages 11, and 14.

19.     Organizational Plaintiff SAJE is a 501(c)(3) non-profit organization located at 152 W. 32nd Street, Los Angeles, California dedicated to supporting and building leadership among working class people in Los Angeles. It has been in operation since 1996.  After learning about Defendants' discriminatory conduct towards tenants of 1423 Magnolia and other Koreatown properties, SAJE intervened to educate tenants in those buildings about their rights as tenants and to assist them in challenging Defendants' unlawful practices.  SAJE has had to divert significant resources, including staff time, to assist tenants who have been harmed by Defendants' discriminatory acts.

## II.   The Defendants

20.     Defendant Optimus Properties, LLC ("Optimus"), a California limited liability company, is a privately held real estate investment company engaged in the acquisition, development, leasing and management, and sale of multifamily, retail and commercial real estate.

21.     Defendant Roxbury Ventures, LLC ("Roxbury"), a California limited liability company, is a privately held real estate investment company engaged in the acquisition, development, leasing and management, and sale of multifamily real estate. It provides some of these services for the subject premises.

22.     Defendant Magnolia Avenue Properties, LLC, a California limited liability company, owned 1423 South Magnolia Avenue from approximately March 2015 until approximately September 2016.

23.     Related entities include the following: (1) South Kenmore Properties, LLC, a California limited liability company, the owner of 250 South Kenmore Avenue, having acquired the building in 2014; (2) South Normandie Properties, LLC, a California limited liability company, the owner of 756 South Normandie

Avenue from approximately May 2014 until approximately November 2016; (3) Normandie Linden, LLC, a California limited liability company, the owner of 837 South Normandie Avenue, having acquired the building in 2015; (4) Mariposa/8th Street Properties, LLC, a California limited liability company, the owner of 238 South Mariposa Avenue, having acquired the building in 2014; (5) MKM Westwood LLC, a California limited liability company, the owner of 401 S. Kenmore, having acquired the building in May 2015; and other entities involved in the ownership, management, and marketing of multifamily dwellings in Koreatown pursuant to Defendants' pattern or practice of discrimination.

24.     Defendant Jerome Mickelson is the Multi-Family Asset Manager/Director of Construction for Optimus. Mickelson is responsible for all housing policies for Defendant Magnolia Avenue Properties, LLC, South Kenmore Properties, LLC, South Normandie Properties, LLC, Normandie Linden, LLC, Mariposa/8th Street Properties, LLC, and, on information and belief, MKM Westwood LLC and other entities that own or owned multifamily dwellings in Koreatown pursuant to Defendants' pattern or practice of discrimination (together, the "Property Entities") and for Defendants Optimus and Roxbury.

## III.   **The Optimus Entities**

25.     Optimus is a vehicle for identifying, assessing, and aggregating potential real estate investments. Optimus, for example, promotes on its website many Koreatown properties that it presents as being in its "portfolio" of investments.

26.     Rather than own the properties outright, the properties in which Optimus invests are owned by companies controlled by Optimus' principals. These companies include the Property Entities.

27.     In order to manage the properties, Optimus and the Property Entities rely on the services of Roxbury. Notices to tenants are often on Roxbury stationery, for example.

28.     Mickelson is a key figure in these efforts. Mickelson has authority over the relevant housing policies at the subject properties and oversees the related practices.

29.     Each one of Optimus, Roxbury, and the Property Entities is an agent, servant, employer, partner, owner or subsidiary, alias, assignee, and/or alter-ego of the others, is acting within the purpose or scope of such relationships and has acted within that purpose at all relevant times, and is engaged in a joint venture.

30.     Roxbury and the Property Entities are mere instrumentalities of Optimus, and Optimus is involved in the day-to-day ownership and management of the subject properties.

31.     Optimus does not respect the separate identities of Roxbury and the Property Entities. There is overwhelming overlap of employees, office space, and payment of salaries among Defendants, including as follows:

(a)     Mickelson serves as the Multi-Family Asset Manager/Director of Construction for the properties owned by the Property Entities. His employer is Optimus, and he is paid by Optimus.

(b)     Optimus and Mickelson directly supervise the on-site managers of the relevant properties.

(c)     Individuals performing work for the Property Entities and Roxbury use their Optimus email address and represent themselves as being from Optimus rather than the Property Entities or Roxbury.

(d)     Individuals employed by Optimus send building management communications to tenants on Roxbury letterhead.

(e)     The Property Entities send building management communications to tenants on Optimus letterhead.

(f)     Optimus shares an office with Roxbury and the Property Entities other than MKM Westwood LLC. That shared office address is 1801 Century Park East, Suite 2100, Los Angeles, CA 90067.

1      (g)    Optimus shares its accounting department with the Property Entities,

2  managing the receipt of payments and the disbursement of funds to its individual

3  vendors and employees.

4      (h)    Optimus represents itself on its webpage as owning the relevant

5  properties, and also lists an Optimus email address as the contact for the individual

6  properties.

7      (i)    All of the entities, except MKM Westwood LLC, list as their agent for

8  service of process the same individual, Kamyar Shabani.

9      32.    On information and belief, the Property Entities are undercapitalized.

10      33.    Optimus employees, the Property Entities, and Roxbury act as agents

11  for the principal, Optimus, when dealing with the relevant properties.

12      34.    Optimus derives financial benefit from the Property Entities and

13  Roxbury. It controls, ratifies, or approves the actions of those entities.

14      35.    A joint venture exists between and among Defendants and the Property

15  Entities. Defendants and the Property Entities have combined their property, skill,

16  and knowledge with the intent to carry out a single business undertaking. To carry

17  out the joint venture of acquiring, renovating, and managing properties, Optimus

18  brings to the venture its access to capital, its market expertise, and its employees,

19  including Mickelson. Roxbury brings its managerial expertise. The Property Entities

20  bring to the venture the legal capacity to hold the relevant properties. These business

21  entities and individuals together have a common business interest, the business of

22  real property investment.

23                       **FACTS**

24  **I.**    **Defendants' Pattern or Practice of Discrimination: The "Koreatown Strategy"**

25

26      36.    Since 2013, Defendants have pursued their so-called "Koreatown

27  Strategy," a complex scheme in the rapidly gentrifying Koreatown neighborhood of

28  Los Angeles, to purchase buildings, displace the existing tenants, renovate vacated

1  units, market the renovated units at much higher rents to young, childless, English-
2  speaking professionals, and "flip" (as defined below) the buildings at a massive
3  profit.

4        37.    Koreatown is ripe for exploitation under Defendants' "Koreatown
5  Strategy." Located near downtown, Mid-Wilshire, and Hollywood, the neighborhood
6  has historically been characterized by dilapidated but architecturally distinct housing
7  stock, relatively low rents affordable to the neighborhood's working-class residents,
8  and significant ethnic and racial diversity, with particularly high numbers of Asian
9  American and Latino families. In recent years, because of the area's proximity to job
10  centers, high quality public transit, vibrant culture and street life, comparatively low
11  housing prices, and historical buildings of significant architectural value, Koreatown
12  has attracted an influx of higher-income residents who are able to afford much higher
13  rents.

14        38.    Each building purchased by Defendants was, at the time of purchase,
15  occupied by significant numbers of Spanish-speaking Latino tenants, families with
16  children, and/or persons with mental disabilities. Each of these groups is a protected
17  class under the FHA.

18        39.    Under the protections of the Los Angeles Rent Stabilization Ordinance
19  ("LARSO"), these preexisting tenants occupied rent-stabilized units, were protected
20  from no-cause evictions, and paid below-market rents.

21        40.    Plaintiffs allege, based on information and belief, that the extraordinary
22  profits that Defendants achieved through their Koreatown Strategy were attained as a
23  direct result of their willingness to evade and break the law. Law-abiding real estate
24  investors in the multifamily residential sector have traditionally relied on
25  renovations, improved management, and legal rent increases to increase rental
26  income, which, in turn, increases property value over time. However, rather than
27  hold a property on a long-term basis, Defendants quickly dispose of the property by
28  implementing a "flip": a short-term strategy that entails purchasing an apartment

1  building and then rapidly taking steps to increase rents, followed by a sale shortly
2  after the property is purchased.

3       41.    Having quickly changed the demographic served by the buildings, and
4  made upgrades only to the units repopulated with more desirable tenants, Defendants
5  are able to sell the buildings for a considerable profit.

6       42.    For example, on December 31, 2014, Defendants announced the sale of
7  3715 West First Street, a 55-unit property "in the gentrifying Los Angeles
8  neighborhood of Koreatown" for $7 million. Defendants stated that after updating
9  only "[a]pproximately 36 percent of the units," they were able to sell the property for
10 a 70% return on the initial investment.

11      43.    Plaintiffs allege, based on information and belief, that Defendants
12 purchased other properties—including the property at issue in this Complaint—with
13 the intent of effecting the same scheme and then "flipping" the properties at a
14 substantial profit.

15      44.    On March 18, 2015, Defendants announced their $2.25 million
16 acquisition of 1423 South Magnolia Avenue, a 24-unit property "situated between
17 gentrifying Korea Town and the University of Southern California." Defendants
18 planned "extensive renovations," but stated that individual units would only be
19 renovated "as they become vacant."

20      45.    Similarly, Defendants announced on April 8, 2015 their $2.2 million
21 acquisition of 837 South Normandie Avenue, a 16-unit property in Koreatown.
22 Defendants again planned "extensive renovations," but said they would only
23 renovate individual units "as they bec[a]me vacant." Defendants stated that "[t]his
24 asset fits nicely into our Koreatown Strategy."

25      46.    The steps Defendants take to increase the value of their new properties
26 primarily involve efforts to drive out existing tenants who are members of protected
27 classes under the FHA. Defendants have exhibited a clear pattern or practice of
28 discriminatory, unlawful, and abusive treatment of these tenants, with the obvious

goal of displacing them. Defendants use an array of discriminatory tactics across their Koreatown properties in order to displace vulnerable tenants, members of protected classes, including at 1423 South Magnolia Avenue. These tactics included the following.

47.    First, Defendants repeatedly present targeted tenants with notices of termination or stipulations of eviction that have no actual legal basis but that appear to non-lawyers—all the more so to those with mental disabilities or those with no or limited ability to read English—as legally binding. Having misrepresented eviction as a *fait accompli*, Defendants are able to achieve the removal of many of the targeted tenants. Only because of the intervention, sometimes belated, of advocates and attorneys did Plaintiffs learn that the notices were invalid and that they did not need to find a new home. Defendants also invent pretextual reasons for eviction, such as the presence of a dog that had been permitted for years or decades before.

48.    Second, Defendants make timely payment of rent increasingly difficult for targeted tenants, while also instituting draconian deadlines for receiving payments and then threatening eviction based on allegedly late payment of rent. Defendants achieve this in part by eliminating on-site payment options, including payment by drop-box or payment to an on-site manager, and instead requiring payment by mail, in person at Defendants' offices in Century City (approximately ten miles away), or through an online system. These new payment methods impose disproportionate hardship on Defendants' Latino tenants, tenant families with children, and disabled tenants, who commonly lack access to banks and to the internet and are therefore forced to rely on the more costly methods of personally traveling to Defendants' offices or obtaining money orders and purchasing mailing protections like certified and registered mail. At other Koreatown properties owned or operated by Defendants, the strict policy requiring rent to be paid on the first of the month causes hardship to disabled tenants who rely on disability-related checks that typically arrive between the 1st and the 5th of the month.

49.     Third, Defendants' property managers frequently engage in verbal harassment of Spanish-speaking tenants, tenants with disabilities, and families with children based on their protected status. For example, as described below, Defendants have told Latino tenants that their food smells "disgusting" and "foul" and that the tenants need to learn to read English since they are in America. In other cases, Defendants have threatened to evict tenants because their children spend time in common areas. All of these measures taken by Defendants have frightened and aggravated tenants, creating a hostile and threatening environment and increasing pressure on them to move.

50.     Fourth, Defendants allow the units occupied by Spanish-speaking Latino tenants, tenant families with children, and mentally disabled tenants to remain in poor condition by refusing or delaying needed maintenance, or by providing substandard workmanship, fixtures, and repairs. Despite Plaintiffs' repeated requests, Defendants fail to correct, or unreasonably delay the correction of, deplorable conditions. At the same time, Defendants renovate newly empty units and advertise them on websites aimed at their target population: persons who are upwardly mobile, childless, English speaking, and without mental disabilities. The process of selectively upgrading the units contributes to Defendants' scheme to displace existing residents. As their buildings become long-term construction sites, life is made even more difficult for those tenants deemed undesirable, who experience none of the benefits from the constant work being performed to upgrade the other units. For example, frequent water shutoffs in many of the buildings, including as many as 50 hours without water over a four-month period, aggravate the tenants' daily lives.

51.     Fifth, Defendants impose invalid rent increases by raising rents in excess of the amount permitted by LARSO, violating the procedure for rent increases for Section 8 tenants, and unlawfully shifting the costs of utilities to tenants in violation of LARSO.

52.     When these methods fail, Defendants resort to issuing repeated and baseless eviction notices for the sole purpose of harassing and intimidating tenants, and sometimes pursuing meritless and/or retaliatory unlawful detainer actions (*i.e.*, eviction proceedings), until the targeted tenants make a legal misstep or simply give up and leave.

53.     Finally, part of Defendants' Koreatown Strategy is targeted marketing to tenants who are young, childless, English-speaking professionals without disabilities. Defendants market unlawfully vacated dwellings in a manner calculated to replace Latino families with children or persons with disabilities with nondisabled, single, young, English-speaking tenants. Through statements and marketing, Defendants seek to induce new residents into (and dissuade former residents from) renting the newly vacated units by representations regarding the entry or prospective entry into the neighborhood of persons of a particular familial status, national origin, or disability status.

54.     Defendants advertise the newly vacated units through the internet. The principal websites used by Defendants are Radpad, Hotpads, and, to a lesser extent, Walk Score. Each website presents information solely in English, and each is carefully curated to target young, English-speaking, single, nondisabled persons. Walk Score targets its marketing of multifamily dwelling units to millennials. Radpad features testimonials from young, single persons who are overwhelmingly white.

55.     Defendants have implemented this scheme not only at 1423 Magnolia, but also at a number of other buildings in Koreatown, including the buildings held by the Property Entities, revealing a pattern or practice of discrimination. In those buildings, Latino tenants, tenant families with children, and tenants with disabilities experienced many of the same abuses described below, including delayed or inadequate repairs, discriminatory remarks, LARSO violations, and baseless eviction notices.

## II.     Federal, State, and Local Housing Laws That Protect Plaintiffs

56.     Defendants' practices violate federal, state and local housing laws.

57.     The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, makes it unlawful to, *inter alia*, (1) deny rental housing or make rental housing unavailable to any person because of race, national origin, familial status, or disability status; (2) discriminate against any person in the terms, conditions, or privileges of a rental, or in the provision of housing services or facilities, because of race, national origin, familial status, or disability status; (3) for profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, familial status, handicap, or national origin; or (4) coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of the equal housing rights granted or protected by the FHA. 42 U.S.C. §§ 3604, 3617. The FHA also prohibits retaliation against persons who exercise their equal housing rights, or who aid or encourage others in exercising their equal housing rights.

58.     Tenants are also protected from discrimination on the basis of race, national origin, disability status, and familial status by state statutes, including California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq.*, and the Unruh Civil Rights Act, Cal. Civ. Code § 51.

59.     Tenants also enjoy robust tenant protections under local laws. Under LARSO, the City of Los Angeles caps rental rate increases, proscribes changes in the terms of tenancy, and limits the grounds on which a landlord is permitted to evict existing tenants. L.A. Mun. Code §§ 151.01 – 151.30. Each of the buildings at issue in this Complaint, which was purchased by Defendants as part of their Koreatown Strategy, is subject to LARSO.

60.     Further, California law secures tenants' rights to safe, habitable living conditions and their ability to maintain their tenancies free from harassment, threats, and unfair business practices. California law protects tenants against retaliatory

1  evictions and harassment intended to coerce and intimidate tenants into vacating
2  their homes. Cal. Civ. Code §§ 1942.5 (retaliatory eviction), 1940.2 (anti-harassment
3  statute). As consumers of housing, tenants are also protected from illegal, unfair, and
4  deceptive business practices causing economic injury. Cal. Bus. & Prof. Code §
5  17200 *et seq.* (Unfair Competition Law).

6      61.     Unscrupulous investors like Defendants, who are willing to break the
7  law, have lucrative opportunities to buy relatively low-priced, rent-stabilized
8  properties, unlawfully remove tenants, quickly raise rents, and achieve extraordinary
9  profits.

10  **III.    1423 South Magnolia Avenue**

11      62.     From March 13, 2015, until approximately September 2016, Defendant
12  Magnolia Avenue Properties, LLC owned the Magnolia Apartments located at 1423
13  South Magnolia Avenue in Los Angeles (the "Magnolia building"). Built in 1913,
14  the Magnolia building is a three-story, 24-unit structure consisting of 12 studio
15  apartments and 12 one-bedroom apartments. Defendant Magnolia Avenue
16  Properties, LLC paid $2,250,000 for the Magnolia building. Defendant Roxbury
17  provided management services for the Magnolia building on behalf of Defendant
18  Magnolia Avenue Properties, LLC, and Defendant Optimus.

19      63.     After the purchase of the Magnolia building, Defendants immediately
20  set to work increasing the value of the building so that it could be "flipped" for a
21  large profit. Defendants focused their efforts on removing tenants who were
22  working-class, Spanish-speaking Latino families with children.

23      64.     At the Magnolia building, Defendants discriminated against Plaintiffs
24  primarily on the basis of their national origin and familial status, explicitly telling
25  Plaintiffs that they should "learn English," that their children cannot play or make
26  noise in the hallway, and threatening to call immigration authorities. To push out
27  Plaintiffs, Defendants used the following tactics, among others, at the Magnolia
28  building: issuing or threatening to issue baseless eviction notices, threatening to call

1  immigration authorities, reprimanding the Plaintiffs' minor children, and issuing

2  excessive water shutoff notices. As a result, Plaintiffs have suffered emotional

3  distress, experienced uninhabitable living conditions, and incurred additional costs to

4  pay their rent. Organizational Plaintiff SAJE has diverted scarce resources to

5  defending against these tactics.

6          ***SAJE***

7          65.    SAJE's mission is to "change public and corporate policy in a manner

8  that provides concrete economic benefits to working class people, increases the

9  economic rights of working class people, and builds leadership through a movement

10 for economic justice; and in the process creating sustainable models of economic

11 democracy."

12         66.    SAJE carries out its mission through strategies that include campaigning

13 for community led development in Los Angeles, training community members to

14 become engaged in planning and governance processes, working with developers

15 and other organizations to increase job opportunities for individuals who face

16 barriers to employment, and helping tenants to secure stable, healthy housing

17 conditions.

18         67.    After Plaintiff Cornelia Martinez attended a tenant clinic run by SAJE

19 in April 2015 and described some of the difficulties she had encountered with

20 Defendants, SAJE began working with tenants at the Magnolia building, including

21 Plaintiffs Cornelia Martinez, Ana Velasquez, Hilda Deras, Carmen Castro, and

22 Gloria Morales.

23         68.    SAJE organizers held a meeting for all tenants of the Magnolia building

24 on April 12, 2015, to advise them of their rights under LARSO and to help them

25 identify legal assistance they could turn to in the face of eviction threats and

26 proceedings.

27         69.    In subsequent meetings with Magnolia building tenants, SAJE

28 organizers learned more about Defendants' abusive conduct towards long-term

Spanish-speaking Latino tenants and tenant families with children. SAJE has been forced to divert significant resources to investigating and combatting Defendants' unlawful practices targeting Spanish-speaking Latino tenants and tenant families with children at several of Defendants' buildings, including illegal rent increases, discriminatory rules affecting families with children, and widespread health and safety concerns resulting from the poor condition of the targeted tenants' apartments.

70.    For example, in December 2015, SAJE organizers conducted a meeting at the Magnolia building to assist tenants, including Plaintiff Martinez, with completing repair request forms. After those complaints were ignored by Defendants, SAJE organizer Favian Gonzalez filed complaints about the poor conditions on behalf of multiple Magnolia building tenants with the Department of Public Health and HCIDLA. Gonzalez subsequently coordinated the inspections, serving as the primary contact for the inspectors. In January 2016, for instance, SAJE made a request for repairs to Defendants on behalf of a tenant named Carina Fabian. This request concerned a leaking bathroom showerhead, peeling paint, roach infestation, and a warped floor.

71.    On February 1, 2016, Gonzalez received an email from Carmen Correa, who, along with her husband, Damian Correa, worked as Defendants' on-site manager at the Magnolia building. The email informed Gonzalez that there would be fumigations and HCIDLA inspections that week.

72.    On February 3, 2016, Gonzalez went to the Magnolia building to be present for the HCIDLA inspections and to support tenants who were concerned about notices for fumigation. Gonzalez spoke with Ms. Correa about the requirement under California law that reasonable notice of 72 hours must be given prior to fumigations so that tenants can prepare. He also explained to Ms. Correa that some of the tenants, including Plaintiff Ana Velasquez, needed an alternative method to eradicate pests due to their children's asthma. Ms. Correa then became very upset with Gonzalez, told him that he was not allowed on the property, and proceeded to

1  call the police. Gonzalez was on the property with the permission of tenants. The

2  police never came.

3      73.    Later that day, Gonzalez sent an email to Defendant Mickelson

4  informing him of his interactions with Ms. Correa and explaining why some tenants

5  needed an alternative method for eradicating pests.

6      74.    Later that same day, Gonzalez received an email from Kamyar Shabani,

7  who stated that he was legal counsel for Defendant Magnolia Avenue Properties,

8  LLC. Shabani threatened that if any tenants refused to allow the pest control

9  company or the on-site manager access to their apartments, Defendant Magnolia

10  Avenue Properties, LLC would take legal action against them and against Gonzalez.

11      75.    On February 4, 2016, Shabani sent another email to Gonzalez, alleging

12  that Gonzalez had advised the tenants to deny access to their units. Shabani again

13  threatened that if tenants continued to deny access, Defendants would file an

14  "unlawful detainer against each and every tenant" who followed Gonzalez's advice.

15  Gonzalez responded that he had never directed tenants to refuse access to the

16  property and that he supported the inspections by the county. Gonzalez explained

17  that he wanted to collaborate with the landlord and the management team.

18      76.    On February 4, 2016, Gonzalez received a threatening phone call from

19  Defendant Mickelson stating that Defendant Mickelson intended to go to the SAJE

20  offices and meet with the executive director of SAJE. Gonzalez then emailed

21  Defendant Mickelson to try to set up a time for him to meet with the executive

22  director. Defendant Mickelson never responded.

23      77.    Following this incident, Gonzalez began conducting weekly meetings at

24  the Magnolia building to discuss notices received by the tenants, to advise them of

25  their rights, and to strategize with them on how to defend their rights against

26  Defendants' abusive practices.

27      78.    Commencing in late March 2016, SAJE organizer Delia Ayala took

28  over the weekly Magnolia building meetings. Ayala continued to investigate

1  concerns tenants expressed regarding conditions at the Magnolia building, including
2  water shutoffs, conditions in tenants' apartments, baseless eviction notices, and
3  verbal harassment by managers. Ayala also continued to educate tenants on their
4  rights and assist them in opposing Defendants' unlawful actions.

5       79.    For example, on April 1, 2016, Ayala helped tenant Carina Fabian draft
6  another repair form that Fabian submitted to the on-site manager; the repair form
7  concerned holes around the kitchen sink counter, leaks from the bathroom and
8  kitchen sinks, mold on the bathroom ceiling, defective plumbing in the bathroom,
9  peeling paint in the bathroom and hallway, defective electricity in the kitchen,
10 broken windows in the bedroom and hallway, defective lock in the bathroom, roach
11 infestation in the kitchen, and defective smoke detectors.

12      80.    On April 4, 2016, HCIDLA inspected Fabian's unit, Martinez's unit,
13 and units of other Magnolia building tenants.

14      81.    Ayala was present for these inspections, and the inspector informed
15 Ayala that the Magnolia building continued to have violations. One of the violations
16 included the unauthorized wall in Fabian's unit.

17      82.    On April 5, 2016, Fabian contacted Ayala asking her to come to the unit
18 because work was being performed and she required assistance communicating with
19 Defendants' maintenance workers.

20      83.    Ayala arrived at the Magnolia building and noticed the low-quality and
21 superficial repairs made by Defendants in units occupied by Fabian and similarly
22 situated tenants. In the unit across the hall from Fabian's unit, the maintenance
23 workers were attempting to replace an old kitchen counter with a dirty counter that
24 was infested with spiders and roaches.

25      84.    Ayala called Defendant Optimus' general property manager, Michael
26 McCain, to explain that this "repair" was unacceptable.

27      85.    On April 6, 2016, Ayala returned to the Magnolia building to continue
28 assisting Fabian and other tenants in their communications with the maintenance

1   workers. The maintenance workers informed Ayala that they were given specific
2   orders by Defendants that if they performed repairs of greater quality than those
3   authorized by Defendants, the maintenance workers would get in trouble.

4          86.    Fabian also called Ayala for assistance regarding an eviction notice she
5   had received on March 2, 2016. The eviction notice alleged that another person
6   living in Fabian's unit drank alcohol and urinated on the fire escape. In April 2016,
7   in retaliation for her complaints regarding her unit, Defendant Magnolia Avenue
8   Properties, LLC filed an unlawful detainer action against Fabian based upon the
9   March eviction notice. On April 11, 2016, Ayala went to Fabian's unit to go over the
10  documents Fabian had received.

11         87.    Around April 14, 2016, Fabian spoke with Defendant Mickelson, as
12  well as with Mr. and Ms. Correa about the unlawful detainer action. Defendant
13  Mickelson was very aggressive towards Fabian and told her that even if she won in
14  court, they would make sure she left the apartment by other means.

15         88.    Fabian was very upset about this interaction and called Ayala to report
16  what happened.

17         89.    Defendant Magnolia Avenue Properties, LLC eventually withdrew the
18  unlawful detainer action against Fabian after producing video footage of the alleged
19  violation in discovery. Fabian did not know the person in the video.

20         90.    SAJE had to divert substantial resources, including significant amounts
21  of staff time, to address Defendants' harassment of Fabian.

22         91.    As with Gonzalez, Defendants responded to Ayala's advocacy on behalf
23  of the tenants with belligerence and intimidation.

24         92.    In one incident that took place on May 5, 2016, Ayala accompanied
25  Defendant Mickelson, Mr. and Ms. Correa, and a supervising contractor on a walk-
26  through of the Magnolia building to view completed repairs. Throughout the walk-
27  through, Defendant Mickelson was hostile to Ayala and the tenants. At the end of the
28  walk-through, on seeing some of the tenants' children playing in the halls, Ms.

1  Correa yelled at Ayala, telling her that she should tell the tenants to control their

2  children.

3       93.    When Ayala returned to the Magnolia building on May 19, 2016 for

4  HCIDLA inspections, Defendant Mickelson informed her, in apparent retaliation for

5  Ayala's advocacy on behalf of tenants, that if any of the tenants were not present she

6  could not enter their units regardless of whether the tenants had given her permission

7  to enter.

8       94.    Another incident occurred after Plaintiffs Velasquez, Castro, and

9  Morales, along with tenant Carina Fabian, approached Ms. Correa about notices they

10 had received threatening eviction based on their children's playing in the hallways in

11 July 2016, which is fully described below. Ms. Correa became angry and threatened

12 to call immigration authorities, social services, and the police on all of them.

13      95.    Velasquez and other tenants notified Ayala of this threatening

14 interaction; Ayala emailed Defendant Mickelson about Ms. Correa's unacceptable

15 conduct. After Ms. Correa denied the accusations, Defendant Mickelson responded

16 by threatening Ayala. He told her, "Get the tenants under control or we will take

17 action," and warned that Defendants would take the matter to court "if the damage

18 and disruption doesn't stop."

19      96.    SAJE's mission of achieving benefits for working class people has been

20 frustrated by Defendants' discriminatory and exploitative conduct towards working

21 class Latino tenants and tenant families with children.  Defendants' tactics of

22 intimidation at the Magnolia building created an obstacle for SAJE's leadership

23 development by penalizing tenants for defending their rights.  Defendants'

24 intimidation and threats also interfered with SAJE's efforts to support tenants in

25 achieving healthy and stable living conditions.

26      97.    Additionally, as Defendants have succeeded in forcing working class

27 Latino tenants out of 1423 Magnolia and other buildings, SAJE's mission has been

28 frustrated by the loss of residents who are prospective members, supporters, and

Complaint

1    beneficiaries of SAJE's economic justice campaigns.  Defendants' strategy of

2    flipping multifamily residential buildings in Koreatown, including the Magnolia

3    building, has directly led to the loss of rental housing that is affordable to the

4    working class Latino residents that SAJE serves, creating a significant barrier to

5    SAJE's goal of achieving concrete economic benefits for that population.

6              ***Cornelia Martinez***

7        98.     Plaintiff Cornelia Martinez is a long-term tenant of the Magnolia

8    building. Martinez is a Spanish-speaking Latina woman who lives with her two

9    children and her husband.

10       99.     As detailed below, during the time that Defendants owned and managed

11    the Magnolia building, Martinez was subjected to many of their discriminatory and

12    abusive practices. At Defendants' hands, Martinez experienced unlawful threats of

13    eviction, inadequate provision of maintenance services, derogatory and harassing

14    statements on the basis of her national origin, a policy restricting her children's right

15    to use of the common areas, an illegal rent increase, and burdensome and

16    discriminatory changes to Defendants' rent payment policies. Defendants also

17    retaliated against Martinez for her organizing activities and requests for repairs.

18       100.    Due to Defendants' failure to provide adequate repairs, Martinez and

19    her family lived with a broken heater, plumbing issues, leaks, broken windows and

20    peeling paint. Meanwhile, Defendants renovated and improved empty units in the

21    building.

22       101.    On April 1, 2015, Martinez submitted a request for repairs to the on-site

23    manager regarding the heater, plumbing problems, broken windows, and peeling

24    paint.

25       102.    On April 2, 2015, after learning that Defendant Magnolia Avenue

26    Properties, LLC was going to remove the screen doors from all of the units, Martinez

27    created a petition asking them not to remove the screen doors. Many tenants of the

28    Magnolia building signed the petition. The tenants wanted to keep the screen doors

1  because during the summer the units, which lack air conditioning, get very hot and

2  the screen doors enabled tenants to leave the doors to their units open to provide

3  cross-ventilation. Defendants ignored the petition and all of the screen doors were

4  removed.

5  103.   In retaliation for her request for repairs and organizing activities,

6  Defendant Magnolia Avenue Properties, LLC sent Martinez an eviction notice

7  demanding payment of April's rent. The notice was dated April 2, 2015, even though

8  Defendants had regularly accepted Martinez's rent during the first week of the

9  month.

10  104.   Martinez asked the on-site manager at the time, known only as Andrea,

11  about the notice, and Andrea told Martinez that Defendants would eventually get rid

12  of all the tenants.

13  105.   Martinez attempted to pay rent on April 7, 2015, but Defendants refused

14  to accept it.

15  106.   Defendant Magnolia Avenue Properties, LLC filed an unlawful detainer

16  action against Martinez on April 9, 2015.

17  107.   That same day, Martinez attended the tenant clinic run by SAJE to seek

18  advice. Between May and June 2015, Martinez was in continuous contact with

19  organizers from SAJE regarding her unlawful detainer action and problems with her

20  unit.

21  108.   The unlawful detainer action against Martinez was dismissed on June

22  25, 2015, when Martinez's counsel filed and argued a motion for summary judgment

23  and counsel for Defendants failed to appear.

24  109.   In April 2015, Andrea made discriminatory and derogatory remarks to

25  Martinez. In one incident, Martinez was cooking Mexican food and Andrea went to

26  Martinez's apartment to tell her that her food smelled disgusting and foul. On

27  another occasion, Martinez asked Andrea to post notices in Spanish so she could

28

1  understand them. Andrea refused to do so, telling Martinez that she is in America so
2  she should learn to speak English.

3       110.   In June 2015, Martinez was standing in her hallway talking to her
4  neighbor while her daughters were playing in the hall. Andrea walked by and told
5  Martinez that her daughters could not play in the hallway.

6       111.   On June 24, 2015, SAJE organizers filed habitability complaints with
7  the Department of Public Health on behalf of Martinez and other tenants in the
8  building. The complaints were addressed with superficial repairs and Martinez
9  continued to have habitability issues.

10       112.   Beginning on October 1, 2015, Defendants eliminated the option of
11  paying rent via the on-site drop box and directly to the manager and instead began
12  requiring Martinez and other Magnolia building tenants to pay rent to their offices in
13  Century City—miles away from the apartment building ("October 2015 Rent
14  Payment Terms"). As a result of this change, Martinez had to purchase money orders
15  and certificates of mailing from the post office to prove that she had actually mailed
16  her rent on time.

17       113.   On December 1, 2015, Martinez and other tenants received a 30-day
18  notice that their rent would be increased. Martinez was given notice that her rent
19  would increase by 4%, an amount above the legally permitted increase of 3% for
20  Martinez's unit.

21       114.   Martinez's counsel submitted a complaint to HCIDLA and the illegal
22  increase was eventually rescinded in March 2016.

23       115.   Despite the complaints to management and the Department of Public
24  Health, in December 2015 Martinez continued to suffer severe problems with her
25  unit, including infestations of rodents, roaches, and bedbugs. Martinez told Andrea
26  about the pests plaguing her home, but, again, she was ignored by Defendants.

27
28

116.   On December 16, 2015, SAJE organizers conducted a meeting at the Magnolia building to assist Martinez and other tenants in completing repair request forms and to learn more about the issues the tenants were facing.

117.   On January 5, 2016, after Defendants ignored the complaints, Martinez's counsel filed complaints with the Department of Public Health and HCIDLA.

118.   On January 14, 2016, in retaliation for Martinez's complaints to Defendants and to the Department of Public Health and HCIDLA, Defendant Magnolia Avenue Properties, LLC issued Martinez an eviction notice alleging that she was delinquent in rent, despite the fact that Martinez had paid her rent ten days earlier.

119.   On January 28, 2016, Martinez's counsel submitted a HCIDLA complaint on Martinez's behalf, charging that the rent increase was illegal.

120.   The February 2016 inspections by the Department of Public Health uncovered violations in Martinez's unit, including cockroaches in multiple life stages and rodent feces.

121.   During the spring of 2016, to appease the Department of Public Health and HCIDLA, Defendants made superficial and inadequate "repairs" to Martinez's unit.

122.   On February 4, 2016, Defendants retaliated against Martinez for her complaints by issuing another eviction notice alleging she was delinquent in rent, even though she had already paid her rent.

123.   On February 22, 2016, Martinez and other Magnolia building tenants received a notice from Defendant Magnolia Avenue Properties, LLC stating that an online property management system would be implemented by April 1, 2016, and would enable tenants to pay their rent online with a debit or credit card, review their ledger and submit maintenance requests. This notice requested that tenants provide their email addresses to the on-site manager.

124.   Martinez and the other low-income Spanish-speaking Latino tenants of the Magnolia building were unable to take advantage of this new system because most of them did not have internet access, computers, email addresses, bank accounts, or credit cards.

125.   This online property management system excluded Martinez and similarly situated tenants and catered to the new, younger, English-speaking tenants who were moving into the Magnolia building's renovated units.

126.   In March 2016, after receiving eviction notices in January and February alleging that they were delinquent on rent payments they had, in fact, mailed, Martinez and Plaintiff Ana Velasquez decided to start personally delivering their rent to Defendants' office in Century City, which was approximately a ten-mile trip from the Magnolia building.

127.   Other Magnolia building tenants joined Martinez and Velasquez in bringing their rent payments to Defendants' office in Century City.

128.   On April 15, 2016, Martinez was served with yet another baseless eviction notice alleging that she was delinquent in rent. The April 15 eviction notice was signed by Michael McCain, Optimus' general property manager, despite the fact that, two weeks earlier, on April 1, 2016, McCain himself had signed and delivered to Martinez a receipt for the rent she had paid that day.

129.   Martinez informed SAJE organizer Ayala about this notice.

130.   Other tenants of the Magnolia building, including Plaintiffs Velasquez and Morales, received similar notices during the same period.

131.   On April 18, 2016, Ayala wrote McCain and Ms. Correa, explaining that the tenants were not delinquent in rent and asking what charges the eviction notices were based on. Ayala never received a response and the notices were never rescinded.

132.   Between February and May 2016, Martinez and other Magnolia building tenants received at least ten notices stating that water would be shut off,

1  representing over fifty hours without access to water. Water was shut off for multiple
2  days in March 2016.

3      133.   Martinez and other Magnolia building tenants who received these
4  notices informed Ayala of the inconvenience of the water shutoffs.

5      134.   Several of the tenants complained to Ms. Correa, but she did not
6  respond.

7      135.   On July 15, 2016, a notice, signed "Management," was posted on
8  Martinez's door about her child playing in the hallway. The notice threatened that
9  Martinez would be evicted if her children continued playing in the hallway.

10     136.   Martinez suffered significant injury as a result of Defendants'
11  discriminatory and abusive conduct. She and her family were forced to endure
12  substandard and unhealthy living conditions for months on end. She experienced
13  significant emotional distress as a result of Defendants' many baseless threats of
14  eviction, the harassing and humiliating comments directed at her by Defendants'
15  employee, and the burdensome and discriminatory rules imposed by Defendants.

16     137.   SAJE had to divert substantial resources, including significant amounts
17  of staff time, to address Defendants' discriminatory and unlawful treatment of
18  Martinez.

19          ***Ana Velasquez***

20     138.   Plaintiff Ana Velasquez has been a tenant of the Magnolia building
21  since December 2010. Velasquez is a Spanish-speaking Latina woman who lives
22  with her husband and two minor children.

23     139.   Like Martinez, Velasquez experienced many of Defendants'
24  discriminatory and abusive practices during the time Defendants owned and
25  managed the Magnolia building. As described below, Velasquez experienced
26  unlawful threats of eviction, inadequate provision of maintenance services,
27  derogatory and harassing statements on the basis of her national origin, a policy
28  restricting her children's right to use of the common areas, an illegal rent increase,

1   burdensome and discriminatory changes to Defendants' rent payment policies, and
2   retaliatory threats and intimidation.

3        140.   In April 2015, Velasquez was watching her daughter and other children
4   play in the hallway outside her apartment. The on-site manager, Andrea, approached
5   Velasquez and told her that her children were not allowed to play in the hallways.

6        141.   Later that month, Velasquez received a notice in English from
7   Defendant Magnolia Avenue Properties, LLC posted on her door.

8        142.   Velasquez did not understand the notice because it was in English and
9   asked Andrea, the manager, to translate it for her. Andrea refused, stating that
10  Velasquez should learn English because she is in America.

11       143.   After Defendants instituted the October 2015 Rent Payment Terms
12  eliminating the on-site payment options, Velasquez faced additional costs and
13  burdens in paying her rent. Velasquez was forced to bear the expenses of certified
14  mailings and payment of her rent days in advance, or personally delivering the rent
15  to Defendants' offices in Century City.

16       144.   In December 2015, Velasquez received a 30-day notice that her rent
17  would increase by 4%, an amount above the legally permitted increase of 3% for her
18  unit.

19       145.   Velasquez's counsel submitted a complaint to HCIDLA and the illegal
20  increase was eventually rescinded in March 2016.

21       146.   In January 2016, Velasquez's counsel submitted a HCIDLA complaint
22  regarding habitability issues in Velasquez's unit, including a clogged bathtub, holes
23  in the walls, and an open electrical socket.

24       147.   Later that month, SAJE sent a request for repairs to Defendants on
25  Velasquez's behalf. The request was ignored.

26       148.   In February 2016, with SAJE's assistance, Velasquez requested that
27  Defendants use a different pest removal procedure rather than fumigation as a
28  reasonable accommodation for her child's asthma. Defendants subsequently denied

1   her requested pest removal procedure, but agreed to provide additional notice prior to
2   fumigating.

3       149.   Shortly thereafter, Defendant Magnolia Avenue Properties, LLC
4   retaliated against Velasquez for her complaints, requests for repairs, and request for
5   reasonable accommodation by issuing a baseless eviction notice alleging that she
6   was delinquent in her rent, despite the fact that she had already paid.

7       150.   Defendant Magnolia Avenue Properties, LLC never instituted unlawful
8   detainer proceedings on the basis of the eviction notice.

9       151.   Following the February 2016 eviction notice, Velasquez and Martinez
10  decided that it was more reliable to personally deliver their rent payments each
11  month to Defendants' Century City office. Velasquez began personally delivering
12  hers and Martinez's rent payments in March 2016, taking buses to travel ten miles to
13  Defendants' office. This trek took Velasquez over an hour each way.

14      152.   Velasquez did not have the ability to access the online rent payment
15  system that Defendants made available beginning in April 2016.

16      153.   In mid-April 2016, Velasquez received another baseless eviction notice
17  falsely alleging that she was delinquent in her rent.

18      154.   Velasquez informed Ayala of this notice. As described above, Ayala
19  wrote McCain and Ms. Correa on April 18, 2016, to explain that Velasquez and other
20  tenants were not delinquent in rent. Ayala never received a response and the notices
21  were never rescinded.

22      155.   Between February and May 2016, Velasquez and other Magnolia
23  building tenants received at least ten notices stating that water would be shut off,
24  representing over fifty hours without access to water. Water was shut off for multiple
25  days in March 2016.

26      156.   On July 15, 2016, Defendant Magnolia Avenue Properties, LLC posted
27  a notice on Velasquez's door regarding her child playing in the hallway. The notice

28

1  threatened that she would receive an eviction notice if her children continued to play
2  in the hallway.

3       157.   On July 18, 2016, a second notice was posted on Velasquez's door
4  threatening that she would receive an eviction notice if her children continued
5  running and playing in the hallways. Plaintiffs Carmen Castro and Gloria Morales
6  received the same notice.

7       158.   Following receipt of the July 18th notice, Velasquez, along with Castro,
8  Morales, and fellow tenant Fabian, went to Mr. and Ms. Correa's apartment to
9  inquire about the notices. Ms. Correa stated that she was under pressure from
10  Defendants in the Century City office to resolve complaints about the children made
11  by new tenants. Throughout the conversation, Ms. Correa became increasingly upset
12  at Velasquez and the other tenants and threatened to call immigration authorities,
13  social services and the police on all of them.

14       159.   In early August 2016, Velasquez received another notice from
15  Defendant Magnolia Avenue Properties, LLC posted on her door, about children
16  playing in the hallway. This notice similarly threatened an eviction if the children
17  continued their activities in the hallways.

18       160.   Velasquez suffered significant injury as a result of Defendants'
19  discriminatory and abusive conduct. She and her family were forced to endure
20  substandard and unhealthy living conditions. She experienced significant emotional
21  distress as a result of Defendants' baseless threats of eviction, the harassing and
22  humiliating comments directed at her by Defendants' employees, and the
23  burdensome and discriminatory rules imposed by Defendants.

24       161.   SAJE had to divert substantial resources, including significant amounts
25  of staff time, to address Defendants' discriminatory and unlawful treatment of
26  Velasquez.

27       ***Hilda Deras***
28

162.    Plaintiff Hilda Deras moved into her apartment in the Magnolia building in September 1977. Deras is a Spanish-speaking Latina woman.

163.    During the period that Defendants owned and managed the Magnolia building, Deras experienced many of Defendants' discriminatory and abusive practices, including the inadequate provision of maintenance and repairs to her unit, a baseless and retaliatory attempt to evict her from her home of many years, and the burdensome rules imposed by Defendants.

164.    Throughout her almost forty-year tenancy, Deras has witnessed the Magnolia building change ownership many times. Following Defendants' acquisition of the property, the harassment, intimidation, and hardships she experienced in her home of decades notably increased.

165.    The October 2015 Rent Payment Terms, which eliminated on-site options for paying rent, created unnecessary hardship for Deras. Because Deras feels more secure if her rent is delivered to the office in person, she had to rely on an arrangement with a neighbor who physically took Deras' rent to Defendants' Century City office.

166.    The online payment system Defendants instituted in April 2016 excluded Deras from participating in the payment platform, as she does not have access to a computer, internet, or email. Instead, the online system caters to the new, younger, English-speaking tenants.

167.    In December 2015, Defendants increased Deras' rent to an amount above the legally permitted increase. Deras and other tenants informed Ayala of this illegal increase. Deras' counsel filed a complaint with HACLA and the increase was eventually rescinded in March 2016.

168.    Between March and May 2016, Deras received at least eight notices about water shutoffs, which totaled over fifty hours without water. Water was shut off for multiple days in March 2016.

169.   Between February and June 2016, Deras received at least twenty notices from Defendants' management demanding access to her unit. The reasons given for the majority of these notices were fumigation and repairs, but during the same period between early to mid-2016, Defendants failed to address many outstanding problems in Deras' unit.

170.   For example, Deras' carpet is old, dilapidated, and has holes. The building management has not replaced the carpet in over twenty years. She had leaks in her bathroom sink. She had a rodent infestation. With the help of Ayala from SAJE, Deras submitted a written complaint to Ms. Correa about many of these issues on April 6, 2016.

171.   On April 15, 2016, less than two weeks after complaining about the problems in her unit, Deras received two different groundless eviction notices.

172.   The first was an eviction notice demanding payment of April 2016 rent, even though Deras had paid her April 2016 rent in full.

173.   The second eviction notice stated that she was required to get rid of her pets or vacate the premises. Deras has had various pets throughout her almost forty-year tenancy. She has always had approval to have her pets and has never had an issue with having pets. Additionally, Defendants were well aware of Deras' pets due to their frequent inspections of her unit and the fact that she would walk her dog twice a day. Until Deras complained about the issues in her unit, Defendants had never said anything about her pets. Furthermore, others in the building, including on-site managers Mr. and Ms. Correa, had pets.

174.   Deras notified Ayala about the notice and Ayala wrote to McCain on April 18, 2016, explaining that Deras has had pets for many years. Neither Ayala nor Deras received any response from Defendants.

175.   On May 10, 2016, in retaliation for her complaints about her unit, Defendant Magnolia Avenue Properties, LLC filed an unlawful detainer action against Deras. After Deras' counsel moved for summary judgment, Defendants

Complaint

1  dismissed their case. But for the legal assistance she received, Defendants' meritless

2  legal action would likely have terminated Deras' decades-long tenancy.

3       176.   Defendants' discriminatory and abusive conduct towards Deras caused

4  her great anxiety and has cost her financially and emotionally. She experienced

5  substandard living conditions and endured the fear of homelessness due to

6  Defendants' efforts to evict her. Additionally, she was forced to spend time and

7  money to ensure that her rent was accepted by Defendants and to fight the baseless

8  eviction proceedings.

9       177.   SAJE had to divert substantial resources, including staff time, to address

10 Defendants' unlawful and discriminatory treatment of Deras.

11      ***Carmen Castro***

12      178.   Plaintiff Carmen Castro has lived in the Magnolia building with her

13 family since 2011. Castro is a Spanish-speaking Latina woman and lives with her

14 husband and two minor children.

15      179.   During the period that Defendants owned and managed the Magnolia

16 building, Castro experienced many of the same discriminatory and unlawful

17 practices as other Latino tenants and tenant families with children in the building,

18 including legally baseless eviction threats, an illegal rent increase, burdensome and

19 discriminatory rules, and threatening and intimidating statements from the building

20 manager.

21      180.   Like other long-term Magnolia building tenants, after the

22 implementation of the October 2015 Rent Payment Terms, by which Defendants

23 stopped accepting rent on site, Castro had to bear the expenses of mailing and paying

24 her rent days in advance, or personally delivering the rent to Defendants' office.

25      181.   In December 2015, similar to other Magnolia building tenants, Castro

26 received a 30-day notice that her rent would increase by 4%, an amount above the

27 legally permitted increase for her unit. The illegal increase was eventually reversed

28 in March 2016.

182.   Castro also suffered due to Defendants' continual harassment and discrimination against her and her children during the period that Defendants owned and managed the Magnolia building.

183.   Around March or April 2015, shortly after Defendants acquired the property, Castro was watching her children play in the hallway. She was approached by the on-site manager at the time, Andrea, who told her that children were not allowed to play in the hallways.

184.   In December 2015, Castro was preparing to take her children to the park and one of her children was waiting for her in the hallway with his scooter. Andrea again confronted Castro and told her that children were not allowed to play in the hallways.

185.   Between February and May 2016, Castro, along with other Magnolia building tenants, received at least ten notices stating that water would be shut off, representing over fifty hours without access to water. Water was shut off for multiple days in March 2016.

186.   Sometime in late February or early March 2016, Castro was preparing dinner in her unit and had her front door open. She could hear her children in the hallway talking in normal voices. She then heard someone yell at them to be quiet. Her children ran back into the apartment and she learned that Mr. Correa told them to be quiet.

187.   In mid-March 2016, Castro's older child was sitting on the stairs with a neighbor's child quietly playing games on a cell phone. Ms. Correa approached both the children and accused them of obstructing the stairs and told them that they were not allowed to play there.

188.   In May 2016, Castro's oldest child was taking out the trash. He set the trash bag down on the floor momentarily while texting or chatting with a friend. Ms. Correa then told Castro that she had seen video footage of her child leaving a trash

1  bag on the floor and that the next time it happened there would be consequences.

2  Castro took this to mean that her family would be evicted.

3      189.   In June 2016, one of Castro's children was playing on the first floor

4  with the child of a neighbor. While he was playing, Ms. Correa scolded him and said

5  that he did not listen and that he could not play in the hallways.

6      190.   On July 8, 2016, Castro received an eviction notice demanding payment

7  of rent, even though Castro had already paid her rent for the month.

8      191.   In the afternoon of July 15, 2016, Castro was watching her younger

9  child play tic-tac-toe in the hallway with a neighbor's child. Later that evening,

10  Castro found a notice from Defendants' management posted on her door regarding

11  her children's play in the hallway and threatening that if this activity continued she

12  would be served with a three-day eviction notice.

13      192.   On July 18, 2016, Castro's child was playing in the hallway with a

14  neighbor's child. Later that evening, Castro received another notice posted on her

15  door, threatening that Castro would be served an eviction notice if her children

16  continued to play in the hallway.

17      193.   As described above, when Castro, Velasquez, Morales, and fellow

18  tenant Carina Fabian approached Ms. Correa about the notices, she threatened that

19  she would call immigration authorities, social services and the police on the four

20  women.

21      194.   On July 28, 2016, Castro received yet another notice from Defendants'

22  management stating that her children were playing soccer on July 26 and 27, 2016,

23  and that if they continued this activity, she would be served with an eviction notice.

24      195.   On August 3, 2016, Castro received a fourth notice about her children

25  playing in the hallway that threatened eviction.

26      196.   On August 11, 2016, one of Castro's children was sitting in front of a

27  friend's apartment playing games on a cell phone. Mr. Correa approached the

28  children and told them to "shh" and to lower the volume on the phone.

Complaint

197.   Defendants' discriminatory and abusive treatment of Castro caused her financial and emotional injury. Castro was forced to incur additional costs to comply with the October 2015 Rent Payment Terms. Further, the constant harassment of Castro and her children, as well as the threats of eviction, greatly worried Castro and caused her and her family stress and anxiety.

198.   SAJE had to divert substantial resources, including staff time, to address Defendants' unlawful and discriminatory treatment of Castro.

### *Gloria Morales*

199.   Plaintiff Gloria Morales has been a tenant of the Magnolia building since July 2012.  Morales is a Spanish-speaking Latina woman who lives with her husband and two minor children.

200.   Like the other Spanish-speaking Latino tenants and tenant families with children at the Magnolia building, Morales experienced Defendants' discriminatory and abusive tactics during the time Defendants owned and managed the Magnolia building.  As detailed below, Morales experienced inadequate provision of maintenance services, unlawful threats of eviction, a policy restricting her children's right to use of the common areas, an illegal rent increase, threats from Defendants' employees, and burdensome and discriminatory changes to Defendants' rent collection policies.

201.   During Defendants' ownership, they failed to provide adequate repairs in Morales' unit.  Morales' unit had a ceiling leak, became infested with cockroaches and mice, and had holes in the kitchen floor and window screens.  Furthermore, as Defendants pursued extensive renovations elsewhere in the Magnolia building, Morales' unit became infested with bedbugs.  Despite Defendants renovating and upgrading the vacated units in the Magnolia building, Morales' unit was not adequately repaired.

202.   As a result of the October 2015 Rent Payment Terms, by which Defendants stopped accepting rent on site, Morales expended additional money each month to deliver her rent via certified mail.

203.   On January 1, 2016, Morales received a 30-day notice from Defendant Magnolia Avenue Properties, LLC that her rent would increase by 4%, an amount above the legally permitted increase of 3% for her unit.

204.   On February 4, 2016, Morales received an eviction notice alleging that she was delinquent in rent for the month of February, even though Morales had already mailed in her rent on time as a money order via certified mail.  SAJE assisted Morales in responding to this eviction notice.

205.   On February 18, 2016, Defendant Magnolia Avenue Properties, LLC, instituted an unlawful detainer action against Morales for failure to pay her February 2016 rent.  However, despite having instituted this unlawful detainer action against her, on March 4, 2016, Defendants cashed Morales' money order for her February 2016 rent.

206.   Because Morales' money order for her February 2016 rent was properly mailed on time and Defendants cashed it, on March 16, 2016, Defendants dismissed the unlawful detainer action against her.

207.   On April 15, 2016, Morales received another baseless eviction notice, claiming she owed an additional $114.70 for her April 2016 rent which she did not owe.

208.   Defendants have stated on multiple occasions that Morales would be evicted if her children played in the Magnolia building's common areas.

209.   On one occasion, the on-site manager at the time, Andrea, knocked on Morales' door and said that the owner did not want children in the hallway, because the hallway "isn't a park."

210.   On another occasion, Andrea stated that if Morales did not keep her children out of the hallway, Morales would be evicted.

211.   In or around Summer 2016, the on-site manager at the time, Ms. Correa, told Morales' children that they were not allowed to sit in the hallway.

212.   Shortly thereafter, Morales began receiving notices stating that if her children were in the hallway she would be evicted.

213.   In or around July 2016, Morales accompanied Plaintiffs Velasquez, Castro, and fellow tenant Fabian in visiting the apartment of Mr. and Ms. Correa to inquire about the notices regarding children in common areas.  As described above, during this conversation, Ms. Correa threatened to call immigration authorities, social services, and the police on Morales and the other tenants.

214.   On August 3, 2016, Defendants posted a notice on Morales' door regarding her children playing in the hallway.  The notice threatened Morales with eviction if her children continued to play in the hallway.

215.   Morales spoke with SAJE on multiple occasions regarding Defendants' threats of evictions.

216.   As with Martinez and Velasquez, Morales also received numerous notices stating that the water would be shut off.  She received multiple notices each month in March, April, and May 2016.

217.   Morales also received numerous notices for entry into her unit.  For example, Morales received four notices to enter her unit in March 2016, with two of those notices covering multi-day spans.  Morales then received six notices to enter her unit in April 2016, with one of these notices covering a multi-day span. Furthermore, Morales received six notices to enter her unit in May 2016 and five such notices in June 2016.

218.   On multiple occasions, Morales asked both on-site managers, Andrea and Ms. Correa, to translate Defendants' English language notices to Spanish. Andrea told Morales that she could not translate the notices because Morales was in the United States and had to speak English.  Ms. Correa told Morales that the owners

1  of the Magnolia building sent notices in English and there was nothing Ms. Correa
2  could do about it.

3      219.   Morales suffered significant injury as a result of Defendants'
4  discriminatory and abusive conduct.  She and her family were forced to endure
5  substandard and unhealthy living conditions.  She was forced to incur additional
6  costs to comply with the October 2015 Rent Payment terms.  The numerous threats
7  of eviction, Defendants' burdensome and discriminatory rules, and the constant
8  harassment of Morales and her children greatly worried Morales and caused her and
9  her family stress and anxiety.

10      220.   SAJE had to divert substantial resources, including significant amounts
11  of staff time, to address Defendants' harassment of Morales.

12              **LEGAL CLAIMS**
13              **FIRST CAUSE OF ACTION**
14  **(All Plaintiffs Against All Defendants for Violations of the Fair Housing Act, 42**
15      **U.S.C. §§ 3601-3619; 24 C.F.R. §§ 100.60-100.85)**

16      221.   Plaintiffs reallege and incorporate by reference each paragraph
17  previously alleged in this Complaint.

18      222.   The Individual Plaintiffs are all members of protected classes under the
19  FHA. Plaintiffs Martinez, Velasquez, Castro, and Morales are Spanish-speaking
20  Latina tenants with children. Plaintiff Deras is a Spanish-speaking Latina tenant.
21  SAJE serves individuals who are members of these protected classes.

22      223.   Based on Defendants' comments and actions herein alleged, Plaintiffs
23  allege and believe Defendants' conduct is motivated by discriminatory intent based
24  on the Individual Plaintiffs' membership in protected classes in contravention of 42
25  U.S.C. § 3604.

26      224.   Defendants' actions in furtherance of their Koreatown Strategy herein
27  alleged, if facially neutral, have had a discriminatory impact on Latino tenants and
28  tenant families with children living in Defendants' buildings, and are not supported

39
Complaint

1  by any substantial and legitimate nondiscriminatory objectives, in contravention of

2  42 U.S.C. § 3604.

3       225.   Defendants have sought to make housing unavailable to and have

4  interfered with the exercise or enjoyment of housing rights by Plaintiffs Martinez,

5  Castro, Deras, Velasquez, and Morales by serving them with baseless or unwarranted

6  eviction notices and other notices or documents designed to pressure them to move,

7  and by making other threats of eviction, because of race, national origin, and/or

8  familial status, in violation of 42 U.S.C. §§ 3604(a), 3617, and 24 C.F.R. §

9  100.60(b)(5). By these same actions, Defendants have discriminated against

10  Plaintiffs Martinez, Castro, Deras, Velasquez, and Morales in the terms and

11  conditions of their tenancy because of race, national origin, and/or familial status in

12  violation of 42 U.S.C. §§ 3604(b).

13       226.   Defendants have discriminated against Plaintiffs Martinez, Velasquez,

14  Deras, Castro, and Morales in the terms and conditions of their tenancy and the

15  provision of facilities or services in connection therewith because of race, national

16  origin, and/or familial status by denying or delaying maintenance services and

17  repairs or providing substandard workmanship, fixtures, and repairs, to those tenants'

18  units while providing freshly renovated units in good and sanitary condition to new

19  tenants who are English-speaking and childless, in violation of 42 U.S.C. §§ 3604(b),

20  and 24 C.F.R. § 100.65(b)(2).

21       227.   Defendants have subjected all Plaintiff tenants to harassment that has

22  the effect of imposing different terms, conditions, or privileges relating to the rental

23  of a dwelling or denying or limiting services in connection therewith on the basis of

24  race, national origin, and/or familial status, in violation of 42 U.S.C. § 3604(b),

25  and/or constitutes unwelcome conduct that is sufficiently severe or pervasive as to

26  interfere with the use or enjoyment of Plaintiff tenants' rental dwellings and the

27  terms, conditions, and privileges thereof, in violation of 24 C.F.R. § 100.65(b)(4).

28  This harassment has included derogatory comments based on Plaintiff tenants'

national origin, coercive and threatening conduct or notices designed to intimidate Plaintiff tenants, and the imposition of substandard living conditions and unduly oppressive and burdensome rules.

228.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC subjected Plaintiffs Martinez, Velasquez, Castro, and Morales to discrimination in the terms, conditions, or privileges of their tenancy and the provision of facilities in connection therewith on the basis of familial status by prohibiting children from reasonable use of the common areas in violation of 42 U.S.C. § 3604(b). Moreover, Defendants responded with threats and intimidation targeted at Plaintiffs Martinez, Velasquez, Castro, and Morales based on their children's use of common areas and their own opposition to Defendants' discriminatory policy, in violation of 42 U.S.C. § 3617.

229.   Defendants have injured Plaintiffs Martinez, Velasquez, Deras, Castro, and Morales by imposing unduly oppressive changes in the terms of their tenancy related to rent collection that have a discriminatory impact on Latino tenants living in Defendants' buildings, in violation of 42 U.S.C. §§ 3604(b) and 3604(f)(2).

230.   Defendants have discriminated against Latino tenants, including Plaintiffs, in the terms, conditions, and privileges of their tenancy or the provision of services and facilities in connection therewith on the basis of national origin by unreasonably refusing to post or explain notices in Spanish, in violation of 42 U.S.C. § 3604(b).

231.   Defendants have, for profit, induced or attempted to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, disability, familial status, or national origin, in violation of 42 U.S.C. § 3604(e) and 24 C.F.R. §§ 100.70-100.85.

232.   Defendants have indicated a preference for limiting the rental of dwellings on the basis of race, national origin, familial status and disability,

including but not limited to discriminatory statements to tenants, including Plaintiffs, and selection of media for advertising the rental of dwellings which deny particular segments of the housing market information about housing opportunities based on race, national origin, familial status or disability in violation of 42 U.S.C. § 3604(c) and 24 C.F.R. §§ 100.70-100.85.

233.   Defendants have implemented practices that have the effect of limiting or denying access to their rental dwellings based on race, national origin, familial status or disability pursuant to their Koreatown Strategy.

234.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC retaliated against Plaintiffs Martinez, and Deras by instituting unlawful detainer actions against those Plaintiffs after they engaged in activity protected by the FHA in violation of 42 U.S.C. § 3617.

235.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC described above frustrated SAJE's mission of building leadership and changing corporate policy, including by enforcing tenant rights and assisting tenants in achieving healthy living conditions. SAJE was forced to divert its scarce resources to investigating the mistreatment of Latino tenants and tenant families with children at the Magnolia building, and to assisting tenants in opposing the illegal and discriminatory conduct.

236.   Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

237.   As a result of Defendants' unlawful conduct, Individual Plaintiffs have suffered harm.

## SECOND CAUSE OF ACTION

**(All Plaintiffs Against All Defendants for Violations of the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900-12996)**

238.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

239.   Based on Defendants' comments and actions herein alleged, Plaintiffs allege and believe Defendants' conduct is motivated by discriminatory intent based on Plaintiffs' membership in protected classes in contravention of Cal. Gov't Code §§ 12955(a), (d) & (k) & 12955.8(a).

240.   Defendants' actions in furtherance of their Koreatown Strategy herein alleged, if facially neutral, have had a discriminatory impact on Latino tenants and tenant families with children living in Defendants' buildings, and are not supported by any substantial and legitimate nondiscriminatory objectives, in contravention of Cal. Gov't Code §§ 12955(a), (d) & (k) & 12955.8(b).

241.   Defendants have sought to make housing unavailable to and have interfered with the exercise or enjoyment of housing rights by Plaintiffs Martinez, Castro, Deras, Velasquez, and Morales by serving them with baseless or unwarranted eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, and/or other notices or documents designed to pressure them to move, and by making other threats of eviction, because of race, national origin, and/or familial status in violation of Cal. Gov't Code § 12955.7. By these same actions, Defendants have discriminated against Plaintiffs Martinez, Castro, Deras, Velasquez, and Morales in the terms and conditions of their tenancy because of race, national origin, and/or familial status in violation of Cal. Gov't Code § 12955(a), (d) & (k).

242.   Defendants have discriminated against Plaintiffs Martinez, Velasquez, Deras, Castro, and Morales in the terms and conditions of their tenancy and the provision of facilities or services in connection therewith because of race, national origin, and/or familial status by denying or delaying maintenance services and repairs, or providing substandard workmanship, fixtures, and repairs, to those tenants' units while providing freshly renovated units in good and sanitary condition to new tenants who are English-speaking, childless, and without mental disabilities, in violation of Cal. Gov't Code § 12955(a), (d) & (k).

243.   Defendants have subjected all Plaintiff tenants to harassment that has the effect of imposing different terms, conditions, or privileges relating to the rental of a dwelling or denying or limiting services in connection therewith on the basis of race, national origin, and/or familial status in violation of Cal. Gov't Code § 12955(a), (d) & (k), and/or constitutes unwelcome conduct that is sufficiently severe or pervasive as to interfere with the use or enjoyment of Plaintiff tenants' rental dwellings and the terms, conditions, or privileges thereof, in violation of Cal. Gov't Code § 12955(a), (d) & (k). This harassment has included derogatory comments based on Plaintiff tenants' national origin, coercive and threatening conduct or notices designed to intimidate Plaintiff tenants, and the imposition of substandard living conditions and unduly oppressive and burdensome rules.

244.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC subjected Plaintiffs Martinez, Velasquez, Castro, and Morales to discrimination in the terms, conditions, or privileges of their tenancy and the provision of facilities in connection therewith on the basis of familial status by prohibiting children from reasonable use of the common areas in violation of Cal. Gov't Code § 12955(a). Moreover, Defendants responded with threats and intimidation targeted at Plaintiffs Martinez, Velasquez, Castro, and Morales based on their children's use of common areas and their own opposition to Defendants' discriminatory policy, in violation of Cal. Gov't Code § 12955(a), (d) & (k).

245.   Defendants have injured Plaintiffs Martinez, Velasquez, Deras, Castro, and Morales by imposing unduly oppressive changes in the terms of their tenancy related to rent collection that have a discriminatory impact on Latino tenants living in Defendants' buildings, in violation of Cal. Gov't Code § 12955(a), (d) & (k).

246.   Defendants have discriminated against Latino tenants, including Plaintiffs, in the terms, conditions, and privileges of their tenancy or the provision of services and facilities in connection therewith on the basis of national origin by unreasonably refusing to post or explain notices in Spanish, in violation of Cal.

Gov't Code § 12955(a), (d) & (k), causing them economic damages and emotional distress.

247.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC retaliated against Plaintiffs Martinez, and Deras by instituting unlawful detainer actions against those Plaintiffs after they engaged in activity protected by the FEHA in violation of Cal. Gov't Code §§ 12955(f) and 12955.7.

248.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC described above frustrated SAJE's mission of building leadership and changing corporate policy, including by enforcing tenant rights and assisting tenants in achieving healthy living conditions. SAJE was forced to divert its scarce resources to investigating the mistreatment of Latino tenants and tenant families with children at the Magnolia building, and to assisting tenants in opposing the illegal and discriminatory conduct, causing them damages in an amount to be determined.

249.   Defendants made, printed, or published, or caused to be made, printed, or published, notices, statements, or advertisements, with respect to the sale or rental of housing accommodations, that indicated a preference, limitation, or discrimination based on race, color, marital status, national origin, ancestry, familial status, source of income, or disability or an intention to make that preference, limitation, or discrimination in violation of Cal. Gov't Code § 12955(c).

250.   Defendants, for profit, induced persons to rent dwellings by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, marital status, ancestry, disability, source of income, familial status, or national origin in violation of Cal. Gov't Code § 12955(h).

251.   Defendants aided, abetted, incited, compelled, or coerced the conduct described herein, or attempted to do so, in violation of Cal. Gov't Code § 12955(g).

252.   Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

253.   As a result of Defendants' unlawful conduct, Individual Plaintiffs have suffered harm.

### THIRD CAUSE OF ACTION

**(Individual Plaintiffs Against All Defendants for Violations of the Unruh Civil Rights Act, Cal. Civ. Code § 51)**

254.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

255.   Defendants Magnolia Avenue Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiff Martinez in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiffs Martinez, Velasquez, and Morales are Spanish-speaking Latina women who live with their minor children; (2) Defendants denied Martinez, Velasquez, and Morales equal accommodations, advantages, facilities, privileges, or services by threatening them with baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, making discriminatory statements and threats of eviction, failing to maintain their units in habitable condition, imposing unduly oppressive changes in the terms of their tenancies, and enforcing policies in a discriminatory fashion; (3) the Latina background, primary language, and familial status of Martinez, Velasquez, and Morales were substantial motivating reasons for Defendants' conduct; (4) Martinez, Velasquez, and Morales have suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Martinez, Velasquez, and Morales.

256.   Defendants Magnolia Avenue Properties, LLC, Optimus, and Roxbury injured Plaintiff Castro in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiff Castro is a Spanish-speaking Latina woman who lives with her minor children; (2) Defendants denied Castro full and equal

accommodations, advantages, facilities, privileges, or services by making discriminatory statements and threats of eviction, failing to maintain her unit in habitable condition, imposing unduly oppressive changes in the terms of her tenancy, and enforcing policies in a discriminatory fashion; (3) the Latino background, primary language, and familial status of Castro were substantial motivating reasons for Defendants' conduct; (4) Castro has suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Castro.

257.   Defendants Magnolia Avenue Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiff Deras in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiff Deras is a Spanish-speaking Latina woman; (2) Defendants denied Deras full and equal accommodations, advantages, facilities, privileges, or services by threatening her with a baseless eviction notice that was not served in good faith or in anticipation of litigation that was seriously contemplated at the time, failing to maintain her unit in habitable condition, imposing unduly oppressive changes in the terms of her tenancy, and enforcing policies in a discriminatory fashion; (3) the Latina background and primary language of Deras were substantial motivating reasons for Defendants' conduct; (4) Deras has suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Deras.

## FOURTH CAUSE OF ACTION

### (Individual Plaintiffs Against All Defendants for Private Nuisance, Cal. Civ. Code § 3479)

258.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

259.   Defendants injured the Individual Plaintiffs by interfering with Plaintiffs' use and enjoyment of their leased residential units, constituting a private nuisance in violation of California Civil Code § 3479.

260.   Defendants, by acting or failing to act, created conditions or permitted conditions to exist that are harmful to health, indecent and offensive to the senses, and are an obstruction to the free use of property, so as to interfere with comfortable enjoyment of life or property. Specifically, Defendants have created such conditions by, among other things, (1) failing to maintain Individual Plaintiffs' units in habitable condition; (2) making false, threatening, and derogatory statements to Individual Plaintiffs; and (3) imposing unduly oppressive changes in the terms of Individual Plaintiffs' tenancies, including unlawful rent increases, changes in the way rent was to be paid, and other policies that created difficulty for Individual Plaintiffs.

261.   These conditions have interfered with Individual Plaintiffs' use and enjoyment of their units, and Plaintiffs did not consent to Defendants' conduct. Moreover, an ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

262.   As a result of Defendants' conduct, Individual Plaintiffs have suffered harm, and the seriousness of that harm outweighs the public benefit of Defendants' conduct. Indeed, there is no social value to Defendants' unlawful actions.

## FIFTH CAUSE OF ACTION

### (Individual Plaintiffs Against All Defendants for Negligence, Cal. Civ. Code § 1714)

263.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

264.   Defendants injured the Individual Plaintiffs by want of ordinary care or skill in the ownership or management of their property, person, or agents in violation of Cal. Civ. Code § 1714.

265.   Defendants were negligent because, as stated above, (1) Defendants violated the FHA, 42 U.S.C. §§ 3601-3619 & 24 C.F.R. §§ 100.60-100.85; the FEHA, Cal. Gov't Code §§ 12900-12996; and the Unruh Civil Rights Act, Cal. Civ.

Code § 51; (2) Defendants' statutory violations were a substantial factor in bringing about the harm suffered by Individual Plaintiffs, including both economic loss and emotional distress; (3) the FHA, FEHA, and Unruh Civil Rights Act were intended to prevent actions like those of Defendants; and (4) the FHA, FEHA, and Unruh Civil Rights Act were intended to protect persons like the Individual Plaintiffs.

266.   Defendants also were negligent because (1) they failed to exercise ordinary skill or care to prevent or remedy the defective conditions that rendered Individual Plaintiffs' units uninhabitable, including failing to substantially meet the standards set forth in Cal. Civ. Code § 1941.1 and Cal. Health and Safety Code § 17920.3; and (2) Defendants' failure to exercise ordinary skill or care was a substantial factor in bringing about the harm suffered by Individual Plaintiffs, including both economic loss and emotional distress.

## SIXTH CAUSE OF ACTION

### (Individual Plaintiffs Against All Defendants for Charging LARSO Excessive Rent, L.A. Mun. Code § 151.10(A))

267.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

268.   As stated above, Defendants demanded payment of rent in excess of the maximum rent or maximum adjusted rent in violation of the provisions of the Los Angeles Rent Stabilization Ordinance, or any regulations or orders promulgated hereunder. Defendants sent notices of illegal rent increases, and/or additional charges for water/trash collection to Plaintiffs Martinez, Velasquez, Deras, Castro, and Morales.

## SEVENTH CAUSE OF ACTION

### (Individual Plaintiffs Against All Defendants for Violations of the California Anti-Harassment Statute, Cal. Civ. Code § 1940.2)

269.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

270.   As stated above, Defendants have used threats of eviction, given certain Individual Plaintiffs unlawful eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, made menacing comments (such as threats to call immigration and social services authorities), and participated in menacing conduct (such as refusing to provide reasonable accommodations).

271.   Defendants' actions were menacing and have deprived the Individual Plaintiffs of the quiet enjoyment of their homes and caused Individual Plaintiffs stress, instability, and in some cases worsened health.

272.   Defendants' actions were conducted in an effort to effectuate their "Koreatown Strategy", and Defendants therefore sought to disrupt Individual Plaintiffs' tenancies and influence Individual Plaintiffs to vacate their homes in order to make a greater profit on their properties.

## EIGHTH CAUSE OF ACTION

### (Individual Plaintiffs Against All Defendants for Retaliation, Cal. Civ. Code § 1942.5(c))

273.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

274.   Defendants, who are lessors under the law, retaliated against the Individual Plaintiffs by, among other things, increasing rent, decreasing services (including forcing Plaintiffs to physically travel to pay rent, charging trash and water fees, failing to maintain units in habitable condition, and refusing to permit pets), and by giving certain Plaintiffs baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time.

275.   Defendants so acted for the purpose of retaliation, and Defendants' actions were intended as punishment for Individual Plaintiffs exercising their legal rights by complaining about the condition of their rental units, after Individual Plaintiffs caused the Department of Public Health and HCIDLA to inspect their

rental units, and after Individual Plaintiffs sought reasonable accommodations on behalf of their children. Each of the Individual Plaintiffs exercised his or her rights in complaining to Defendants to secure quiet enjoyment of his or her rental properties.

276.   Plaintiffs' protected actions occurred within six months of Defendants' retaliatory reactions.

## NINTH CAUSE OF ACTION

**(All Plaintiffs Against All Defendants for Unfair Competition, Cal. Bus. & Prof. Code §§ 17200-17210)**

277.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

278.   Defendants have engaged in unlawful business practices by employing menacing conduct in an effort to remove Plaintiffs from their rental homes through harassment, by distributing unlawful eviction notices and threats in violation of FHA and FEHA, and by denying plaintiffs' adequate and timely maintenance and repair services on an equal basis, in violation of FHA and FEHA.

279.   Defendants have additionally engaged in an unfair business practice by issuing to Plaintiffs Deras, Martinez, Velasquez, and Morales baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time.

280.   Defendants engaged in unlawful, unfair, and deceptive business practices by serving Plaintiff tenants with notices that purported to effect changes that were not permitted by law, including the application of "move-out dates" notwithstanding Plaintiffs' continuing right to remain in their units and the imposition of invalid rent increases or additional charges for utility services.

281.   Defendants engaged in a further unfair business practice by imposing unconscionable changes to the rent collection terms in each of their buildings. Defendants imposed these rent collection terms without negotiation, through the exercise of their superior bargaining power, and in a context where Plaintiff tenants,

and other similarly situated tenants, locked into a landlord-tenant relationship with Defendants, had no meaningful choice. Further, by breaking with long-established practice and lacking in reasonable justification, the changed rent collection terms fell outside of the tenants' reasonable expectations. By requiring tenants to incur additional costs to comply with the new terms, on the pain of facing eviction, the new rent collection terms unfairly placed the risk of loss on tenants, including Individual Plaintiffs.

282.   Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the harm to Individual Plaintiffs and other tenants outweighs any conceivable utility from Defendants' actions. Moreover, because Plaintiffs and similarly situated tenants live in a building formerly owned and managed by Defendants, and because the tenants, including Individual Plaintiffs, were not at fault or responsible for the oppressive practices described herein, the tenants could not have reasonably avoided the injury caused by Defendants' unfair business practices.

283.   Defendants' unlawful actions have caused economic injuries to Plaintiffs, including requiring them to make unnecessary travel to Century City, forcing them to incur unlawful costs (including the cost of certified mailing, repairs, and unlawful water and trash collection fees), causing them a loss of use and enjoyment of their rental property, and resulting in the payment of excess rent in light of the substandard and uninhabitable conditions of Plaintiffs' units.

284.   Defendants' unlawful and unfair business practices have caused SAJE to lose economic resources by diverting staff time to protect the tenants of the Magnolia Building, constituting economic injury.

## **RELIEF SOUGHT**

285.   Plaintiffs seek an order from the Court:

(a)    Issuing a declaratory judgment in favor of Plaintiffs;

(b)     Granting permanent injunctive relief enjoining Defendants from taking further actions which will displace or harm Plaintiffs and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(c)     Awarding compensatory and statuary damages to Plaintiffs, including damages to organizational Plaintiff SAJE equal to the diversion of organizational resources and frustration of mission damages incurred as a result of Defendants' actions;

(d)     Awarding restitution of excess rent paid by Plaintiff tenants pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*;

(e)     Awarding punitive and exemplary damages to Plaintiffs pursuant to 42 U.S.C. § 3613(c) and Cal. Civ. Code §§ 1942.5(f) and 3294(a).

(f)     Awarding costs and attorney fees to Plaintiffs pursuant to 42 U.S.C. § 3613, Cal. Gov't Code § 12989.2, Cal. Civ. Proc. Code § 1021.5, Cal. Civ. Code §§ 1717, 1942.5(h), L.A. Mun. Code § 151.10(A), and any other relevant law authorizing such relief; and

(g)     Granting such further relief as the Court may deem just.

All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Respectfully submitted,

Dated:  May 11, 2017                    PUBLIC COUNSEL

                                        */s/ Deepika Sharma*
                                        Anne K. Richardson
                                        Deepika Sharma
                                        Sarah E. Truesdell

Dated:  May 11, 2017          SKADDEN, ARPS, SLATE, MEAGHER &
                              FLOM LLP


                              */s/ Matthew E. Sloan*
                              Matthew E. Sloan
                              Emily Ludmir Aviad
                              Daniel O. Blau
                              Ross M. Cuff
                              Rachael T. Schiffman
                              Antonieta M. Pimienta

Dated:  May 11, 2017          BRANCART & BRANCART


                              */s/ Christopher Brancart*
                              Christopher Brancart

Dated:  May 11, 2017          PUBLIC ADVOCATES INC.


                              */s/ Anne P. Bellows*
                              Anne P. Bellows


                              *Attorneys for Plaintiffs*


# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal
Rules of Civil Procedure.

Dated:  May 11, 2017          PUBLIC COUNSEL


                              */s/ Deepika Sharma*
                              Anne K. Richardson
                              Deepika Sharma
                              Sarah E. Truesdell

1   Dated:  May 11, 2017          SKADDEN, ARPS, SLATE, MEAGHER &
                                        FLOM LLP

2

3                                 */s/ Matthew E. Sloan*
                                 Matthew E. Sloan

4                                 Emily Ludmir Aviad
                                 Daniel O. Blau

5                                 Ross M. Cuff
                                 Rachael T. Schiffman

6                                 Antonieta M. Pimienta

7   Dated:  May 11, 2017          BRANCART & BRANCART

8

9                                 */s/ Christopher Brancart*
                                 Christopher Brancart

10  Dated:  May 11, 2017          PUBLIC ADVOCATES INC.

11

12                                 */s/ Anne P. Bellows*
                                 Anne P. Bellows

13

14                                 *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint